Filed 6/2/15  In re Eric R. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ERIC R., a Person Coming Under the Juvenile Court Law. | B257838 (c/w B258867) (Los Angeles County Super. Ct. No. CK93656) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. BRENDA C. et al., Defendants and Appellants. | |

APPEAL from a judgment and orders of the Superior Court of Los Angeles County.  Daniel Zeke Zeidler, Judge.  Affirmed.

Maureen L. Keaney, under appointment by the Court of Appeal, for Defendant and Appellant Brenda C.

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant Jorge R.

Tarkian & Associates and Arezoo Pichvai for Plaintiff and Respondent.

_____

Brenda C. (mother) and Jorge R. (father) appeal[1] from a juvenile court judgment terminating their parental rights to their son, Eric R. (Eric, born Jan. 2010) and the juvenile court's orders denying mother's two petitions for modification. (Welf. & Inst. Code, §§ 366.26, 388.)[2]

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Referral to the Department of Children and Family Services (DCFS)*

On March 15, 2012, DCFS received a referral alleging that mother and father used methamphetamine on a daily basis in the child's presence. Mother and father would sleep all day and, during that time, Eric would wander around on his own. Further, father would yell at Eric and the parents would fight in front of him.

During an interview with the investigating social worker, mother denied that she currently used drugs. She admitted to having used methamphetamine in the past, but reported that the last time she had used was three or four years earlier. She had been arrested for shoplifting and was scheduled to appear in criminal court that month.

Father also denied that he and mother abused drugs.

Mother and father submitted to a drug test on March 19, 2012, and the results were negative.

On May 22, 2012, mother and father visited the DCFS office. DCFS staff observed mother and father to be under the influence of something. Mother was acting very erratically and jittery and appeared extremely nervous. Her pupils were constricted. Father was acting in an aggressive manner and his breath smelled of alcohol. Both parents were wearing dirty clothes and appeared disheveled.

---

[1] Although father filed a notice of appeal, he does not advance any arguments in his opening brief. Instead, "he joins in the arguments presented by" mother. We thus limit our discussion to the arguments raised by mother.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

The social worker observed that Eric was filthy and not wearing shoes. DCFS placed Eric in protective custody. At the time, mother stated: "'I understand why you have concerns to take him. I agree and I will show you guys that I love my son very much.'"

Mother and father submitted to a drug test that day; mother's test was negative, and father's test was positive for alcohol.

*Team Decision Making Meeting*

On May 24, 2012, the social worker held a team decision making meeting with mother and father to discuss the possible release of Eric to mother. Mother stated that she did not abuse any drugs and that she had been sober for three years. Father admitted that he was an alcoholic. Father stated that the verbal arguments between him and mother occurred and escalated while he was under the influence of alcohol. Father admitted that there were occasions where he would "hold" mother; mother reported that she had learned to stay away from father when he had been drinking.

The social worker informed mother that DCFS would consider releasing Eric to her if she could come up with a plan to have father stay out of the home. Mother and father indicated that neither one had anywhere else to live. Mother believed that it was best for Eric to stay in foster care so that she could participate in the recommended programs and get back on her feet. Father stated that he would begin to search for employment to support mother.

*Section 300 Petition and Detention Hearing*

On May 25, 2012, DCFS filed a petition pursuant to section 300, subdivisions (a) and (b), on behalf of Eric. The petition alleged that (1) mother and father had a history of engaging in violent altercations; (2) on prior occasions, father choked mother, slapped her, and hit her in the legs with his fists; and (3) mother and father each had a history of drug abuse and both currently abused methamphetamine. The juvenile court ordered Eric detained in foster care, but gave DCFS discretion to release Eric to mother if father moved into an in-patient treatment program. Mother was granted unmonitored visits with Eric.

3

*Jurisdiction and Disposition Hearing*

On July 6, 2012, the juvenile court sustained the petition and declared Eric a dependent under section 300, subdivisions (a) and (b). The juvenile court ordered DCFS to provide family reunification services to both parents. Mother was ordered to participate in individual counseling to address domestic violence, parenting classes, and 10 weekly on-demand drug tests. If any drug test came back positive, mother was ordered to participate in a drug rehabilitation program. Finally, mother was granted unmonitored visitation if she complied with the case plan.

*Status Review Report*

On July 12, 2012, DCFS placed Eric in the foster home of Mr. and Mrs. R. While in his placement, Eric began to talk. He became playful and sociable. He was no longer scared of people and did not hide from others. Mr. and Mrs. R. loved him, and Eric improved tremendously in their home. He was always neatly dressed and had good hygiene. He also participated in play therapy.

Mother visited Eric on Thursdays from 10:30 a.m. to 12:00 p.m. The visits went well. Mother indicated that she wanted Eric placed with her in the substance abuse program.

On November 15, 2012, mother enrolled in the New House, Inc., substance abuse program. Initially, she was scheduled to attend the program for 30 days, but she extended her stay to 90 days. Mother participated in individual therapy, group therapy, and a 12-step program. She was learning relapse prevention, anger management, and new coping skills to deal with her addiction. Her case manager reported that she demonstrated a positive attitude and a willingness to change.

*Six-month Review Hearing*

On January 23, 2013, the juvenile court held the six-month review hearing under section 366.21, subdivision (e), and found mother in partial compliance with the case plan. The juvenile court ordered DCFS to refer mother to an individual therapist with experience in domestic violence.

*Status Review Report*

On February 12, 2013, mother completed her in-patient drug treatment program, and on June 5, 2013, she completed her parenting classes.

According to the foster family agency quarterly report dated May 22, 2013, mother visited with Eric on January 10, 17, and 24, and February 27, 2013. After that, she had weekly visits with him from April 3 to May 22, 2013. During those visits, mother engaged Eric, but he would hit and spit at her. The social worker reported that during the visit on April 3, 2013, mother appeared very jittery; she was constantly moving her feet and jaw.

In a letter dated June 18, 2013, mother's therapist stated that mother had been enrolled in individual therapy since May 2, 2013. Mother agreed to work on learning and practicing positive coping mechanisms to help decrease her anxiety. Mother had made progress since her enrollment in therapy.

On June 21, 2013, the social worker reported that while mother had provided the social worker with completion certificates from her programs, mother had missed several drug tests between January and May 2013.

Meanwhile, Eric continued to live with Mr. and Mrs. R. and they expressed their desire to adopt Eric if he was unable to reunify with mother and father.

*12-month Review Hearing*

At the July 1, 2013, 12-month review hearing (§ 366.21, subd. (f)), the juvenile court found that mother was in partial compliance with the case plan. It ordered DCFS to continue to provide family reunification services and gave it discretion to liberalize visits, including overnight visits.

*Status Review Report*

On September 30, 2013, the social worker received a message from mother's individual therapist, stating that as a result of mother's excessive absences from therapy, her case was being closed.

On November 21, 2013, the social worker reported that mother tested positive for methamphetamine on July 1, 2013. She failed to show up for five drug tests between

5

July and September 2013. On October 22, 2013, Mrs. R. contacted mother to reschedule a visit. During the conversation, mother stumbled over her words, spoke quickly, and did not make sense. Mrs. R. decided it would be best to just keep the regular visitation time. On November 4, 2013, the social worker received a voicemail message from mother stating that if she and father were not going to get Eric back, then they wanted to relinquish their rights to him to their friend, Martha M. Mother's speech was very fast on the voicemail message.

*Various Reports on Mother's Visits with Eric*

Mother continued to visit Eric regularly. He continued to hit mother and father, and he would hide behind a couch during the visits. The frequency of Eric hitting his parents was less, but he would often tell them to leave him alone.

During a visit on November 13, 2013, mother became frustrated because Eric was tired and not paying attention to her. Mother and father argued about how mother was annoyed with Eric, and the child sat and ignored his parents. Eric stated that mother and father were mean, and he grabbed mother's arm and pinched it. Eric later slapped mother's face.

During a visit on November 20, 2013, Eric kept telling mother to "'stop it,'" while mother was only sitting on a chair. Mother then moved Eric's sandwich and he yelled at her. Mother appeared annoyed that Eric was not paying attention to her. While coloring, Eric said, "'[M]ommy hurt me.'" Mother asked Eric, "'[T]ell Mommy who hurt you,'" and he replied, "'Mommy being mean.'" Mother asked Eric if she could see him the following week, and he shook his head no.

On November 27, 2013, mother attempted to kiss Eric during the visit, and Eric made a growling sound. He appeared sad and, for a while, he laid his head on mother's stomach while she read to him. On December 4, 2013, mother called Eric her "baby," and he screamed "'no.'" Mother then sat on the floor next to Eric and he got up and hid behind the couch. Mother told Eric that he if he did not come out from behind the sofa, she would leave. Eric then moved away from the sofa and said, "'No, Mommy. No leave.'"

On December 11, 2013, Eric refused to enter the visitation room; mother carried him inside. He yelled at father and kicked him. On December 18, 2013, Eric became annoyed when mother and father attempted to help him while they were putting a puzzle together. On December 24, 2013, mother walked up to Eric, but he would not look at her for 30 seconds. When father asked Eric for a hug, Eric walked away.

On January 15, 2014, when mother attempted to help Eric, he got frustrated and said, "'I do it.'" Mother attempted to kiss Eric and he refused. On January 31, 2014, Eric appeared angry at the beginning of the visit. Mother put food on the table and Eric made a grunting noise. She then gave him a juice box and attempted to put the straw in it. Eric got mad and said, "'[L]et me do it.'" When mother tried to clean Eric's hands, he said, "'[S]top.'" During that visit, Eric yelled at mother and father every time they made a sound, and he moved his table away from them. When mother began to read Eric a book, he grabbed the book and threw it on the ground.

On February 5, 2014, mother attempted to help Eric open a biscuit sandwich. Eric yelled, "'[L]et me do it,'" and hit mother on the arm with a closed fist. Mother asked Eric if she could have some of the cookies that she brought him, and he yelled, "'[N]o.'" Mother pretended to cry and Eric ignored her. Mother asked Eric for a hug at the end of the visit and he said "'[N]o.'"

On February 12, 2014, Eric appeared to be in a good mood and was talkative when Mr. R. dropped him off at the foster family agency for a visit. Once he got to the visitation room, he became quiet and looked sad. Mother attempted to get a hug and kiss from him, but Eric said, "'[N]o, go bye bye.'" Eric then began to cry, and mother also began to cry. Mother hugged Eric and the monitor of the visit reminded her to keep things upbeat. Mother stopped crying and left the room. Eric became upset and tried to follow mother. Mr. R. arrived to pick Eric up, and Eric went to him for comfort. Eric sat on Mr. R.'s lap and hugged him.

Meanwhile, Eric continued to live with Mr. and Mrs. R. and had a strong attachment to them. Mr. and Mrs. R. continued to express their commitment to providing

Eric with a nurturing and stable home.  Their adoption home study was approved on December 27, 2013.

*Juvenile Court Hearing*

On February 26, 2014, more than 18 months after family reunification services had first been ordered, the juvenile court found that Eric could not be returned to his parents' physical custody and there was no substantial probability that he would be returned to them within six months.  It then terminated family reunification services.  The juvenile court stated that there was a possibility of legal guardianship or adoption and set the matter for a section 366.26 hearing.

*May 22, 2014, Report from Foster Family Agency*

The foster family agency social worker reported that Eric continued to display a strong attachment to Mr. and Mrs. R.  She observed Eric walk up to Mr. and Mrs. R. and hug them on several occasions.  Further, he appeared to enjoy playing and interacting with his foster siblings and had a big smile on his face when he was around them.

*Mother's First Section 388 Petition*

On June 24, 2014, mother filed a section 388 petition for modification of the juvenile court's order terminating family reunification services.  She stated that she had been attending an in-patient drug treatment program since April 14, 2014, and drug testing regularly through the program.  She added that she was no longer in a relationship with father, and that she had learned to take care of herself and be a better mother.  She requested that the juvenile court reinstate family reunification services and claimed that her proposed modification was in Eric's best interest because she had visited him consistently every week since her last court date and that she had a close bond with him.

Attached to her petition was a letter she wrote dated June 17, 2014, in which she stated that she was in her last month of an in-patient drug treatment program.  In her program, mother had learned to take care of herself, cope with past issues, and become more independent.  Also attached to her petition was a letter dated June 20, 2014, from her counselor, confirming that mother had entered the in-patient drug treatment program on April 14, 2014, and had completed 67 days of treatment.  Finally, mother attached the

8

results of her drug tests. She had tested positive for methamphetamine once (on Apr. 14, 2014), and negative seven times between April 23 and June 4, 2014.

The juvenile court summarily denied mother's section 388 petition finding "no legal basis to reinstate [family reunification services] with a [section 366.26 hearing] pending."

On July 3, 2014, mother timely filed a notice of appeal from the juvenile court's June 24, 2014, order summarily denying her section 388 petition.

*Mother's Second Section 388 Petition*

On August 19, 2014, mother filed a second section 388 petition. She stated that on July 13, 2014, she had completed the in-patient drug treatment program. She had tested regularly while in the program and she was no longer in a relationship with father. She had learned to take care of herself and was a better person. She requested that the juvenile court reinstate family reunification services, return Eric to her custody, take the section 366.26 hearing off calendar, liberalize her visits to overnight visits, or order Eric into a plan of legal guardianship. Mother stated that the proposed modification was in Eric's best interest because she had visited him consistently and had a close bond with him.

The juvenile court denied this petition "as to her request to reinstate reunification services because there is no legal basis to reinstate [family reunification services] with a [section 366.26 hearing] pending. [The juvenile court] denied [the petition] as to her request to go to guardianship because that's part of the [section 366.26] hearing issues. [The juvenile court] denied [the petition] as to the request to go home of mother because it's premature to go from monitored [visits] directly to home of parent." The juvenile court stated: "In effect, some of those things did not state sufficient new evidence or change of circumstances, nor did they show that the proposed change promotes the best interest of the child." The juvenile court then granted mother a hearing on the liberalization of visits issue only, reasoning that "that is the one type of [section] 388 issue that doesn't need to be handled before the [section 366.26 hearing] and only needs to be handled if we don't terminate parental rights, that would be handled after the

9

[section 366.26 hearing] if I don't terminate parental rights." The juvenile court continued: "Most [section 388 petitions] at a [section 366.26 hearing] need to be handled before the [section 366.26 hearing] as to whether to go to home of parent or things like that, but the visitation doesn't impact the [section 366.26] issues in terms of visitation ordered the same day."

*Section 366.26 Hearing*

The juvenile court held the section 366.26 hearing on August 27, 2014. At the onset of the hearing, the juvenile court stated: "The matter is on calendar for a contested [section 366.26] hearing, and if parental rights are not terminated, then a hearing on a [section] 388 [petition] regarding liberalization of visits [will be held]."

Mother testified that she and father had had monitored visits with Eric every Wednesday for two or three hours. During those visits, they would read, color, build puzzles, watch movies, or play games on her cellular telephone. Mother opined that the visits were going well.

Father testified that during the visits, they would read, play, color, and look at planes and helicopters. In response to how Eric reacted during those visits, father stated: "He acts well. I mean sometimes[] he comes in in a bad mood[.] [M]aybe it's due to he's just waking up or he just comes in a bad mood sometimes. But recently, he's been cooperating. Our son I see, he's always waiting for the grub, you know." Father stated that Eric would act awkward at the end of the visits because he did not want father and mother to leave. When asked how he knew that Eric wished for them to stay, father said: "Because he starts to tear or he starts acting rebellious, like he wants to come home with us, but he acts like—yeah, like sad and, you know, things like that."

Counsel then argued. Counsel for Eric and DCFS requested that the juvenile court terminate parental rights and free Eric for adoption.

After entertaining oral argument, the juvenile court terminated parental rights. It found that Eric had been out of mother and father's care for half of his life and that they were not the ones who filled a parental role for Eric. It stated: "The parents discussed coloring, playing, but they're really not the ones changing diapers, feeding, bathing, [et

10

cetera], and really have not had a parental role or relationship in the child's life since the child was detained from them over two years ago. And the visitation and contact they've been having has not conferred a parental role and relationship." The juvenile court continued: "Even to the extent that that may be the case, any parental role and relationship the parents have shown today does not outweigh the benefits of permanence and adoption as required by the law to prevent termination of parental rights." It found Eric adoptable and terminated parental rights.

The juvenile court then stated: "While I don't want to pass the buck, I really tried to lay everything out that I just said in a way that the parents understand that the [L]egislature has created the scheme, the way to determine when to free a child for adoption and when not to. And I can't, as the law lays it out today, do anything other than termination of parental rights and identification of adoption as the plan based upon the information I have before me."

Regarding mother's pending section 388 petition, the juvenile court denied it, stating: "The [section 388 petition] falls away as moot. Since parental rights are terminated, I'm not going to get into liberalization of visitation issues."

*Appeal*

Mother and father filed notices of appeal challenging the juvenile court's order terminating their parental rights.

## DISCUSSION

I. *Termination of Parental Rights*

Mother argues that the juvenile court erred in terminating her parental rights to Eric because the parental benefit exception to termination applies here. (§ 366.26, subd. (c)(1)(B)(i).)

A. <u>Standard of review</u>

"For years California courts have diverged in their view about the applicable standard of review for an appellate challenge to a juvenile court ruling rejecting a claim that an adoption exception applies. Most courts have applied the substantial evidence standard of review to this determination [citations], although at least one court has

11

concluded that it is properly reviewed for an abuse of discretion [citation]. Recently, the Sixth Appellate District has cogently expressed the view that the review of an adoption exception incorporates both the substantial evidence and the abuse of discretion standards of review. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315 (*Bailey J.*).) The *Bailey J.* court observed that the juvenile court's decision whether an adoption exception applies involves two component determinations: a factual and a discretionary one. The first determination—most commonly whether a beneficial parental or sibling relationship exists . . . is, because of its factual nature, properly reviewed for substantial evidence. [Citation.] The second determination in the exception analysis is whether the existence of that relationship or other specified statutory circumstance constitutes 'a compelling reason for determining that termination would be detrimental to the child.' [Citations.] This '"quintessentially" discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption,' is appropriately reviewed under the deferential abuse of discretion standard. [Citation.]" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621–622.) Like the courts in *Bailey J.* and *In re K.P.*, we apply the composite standard of review here.

B. Parental benefit exception

At the section 366.26 hearing, the juvenile court's task is to select and implement a permanent plan for the dependent child. When there is no probability of reunification with a parent, adoption is the preferred permanent plan. (§ 366.26, subd. (b)(1); *In re Marina S.* (2005) 132 Cal.App.4th 158, 164.) If the juvenile court finds by clear and convincing evidence that a child is likely to be adopted, the juvenile court must terminate parental rights, unless one of several statutory exceptions applies. (§ 366.26, subd. (c)(1); *In re Marina S.*, *supra*, at p. 164.)

To satisfy the parent-child exception to termination of parental rights in section 366.26, subdivision (c)(1)(B)(i), a parent must prove he or she has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i); see *In re Derek W.* (1999) 73 Cal.App.4th

12

823, 826 ["parent has the burden to show that the statutory exception applies"].) The "benefit" prong of the exception requires the parent to prove his or her relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 ["the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer"].) No matter how loving and frequent the contact, and notwithstanding the existence of an "emotional bond" with the child, "the parents must show that they occupy 'a parental role' in the child's life." (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418–1419.) The relationship that gives rise to this exception to the statutory preference for adoption "characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

Moreover, "[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

A court may consider the relationship between a parent and a child in the context of a dependency setting, e.g., amount of visitation permitted, whether the parent was ever the child's primary caretaker. (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1537–1538.) But the overriding concern is whether the benefit gained by continuing the relationship between the biological parent and the child outweighs the benefit conferred by adoption. (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1155–1156; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Mother has not shown that the juvenile court erred in finding that this exception to the termination of parental rights does not apply. While mother may have visited with Eric regularly, those visits were riddled with problems. Eric often hit mother, yelled at her, or hid behind the couch to avoid her.

Moreover, the two did not share a parent/child relationship that required preservation. There is no evidence that mother attended to Eric's physical care, nourishment, comfort, affection, stimulation, companionship, and shared experiences. As the juvenile court noted, while the parents "discussed coloring [and] playing," they were not "the ones changing diapers, feeding [or] bathing" Eric. In other words, mother did not occupy a parental role in Eric's life.

In contrast, Mr. and Mrs. R. had been meeting all of Eric's medical, emotional, and physical needs for half of his life. In their care, he appeared well-adjusted, happy, and well-cared for.

Mother suggests that guardianship would have been a more appropriate plan here. We cannot agree. Adoption is preferred over foster care placement and other "potentially temporary provisions for care," such as guardianship. (*In re Debra M.* (1987) 189 Cal.App.3d 1032, 1038, superseded by statute on other grounds as stated in *In re Eli F.* (1989) 212 Cal.App.3d 228, 234; *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker'"].) If the juvenile court determines that a child is likely to be adopted and cannot be returned home, the less permanent options of guardianship and long-term foster care are not pursued because the child's need for permanence and stability is paramount. (*In re Jose V.* (1996) 50 Cal.App.4th 1792, 1799.) Here, no one disputes that Eric is likely to be adopted. Thus, the juvenile court properly ordered adoption as opposed to guardianship.

II. *Section 388 Petitions*

Mother contends that the juvenile court erred in denying her two section 388 petitions.

A. Applicable law

Section 388, subdivision (a )(1), provides, in relevant part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstances or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made."

14

(See also *In re Brandon C.* (1993) 19 Cal.App.4th 1168, 1172; Cal. Rules of Court, rule 5.570(f).) "Section 388 provides the 'escape mechanism' . . . built into the process to allow the court to consider new information. [¶] . . . Even after the focus has shifted from reunification, the scheme provides a means for the court to address a legitimate change of circumstances . . . . [¶] . . . [T]he Legislature has provided the procedure pursuant to section 388 to accommodate the possibility that circumstances may change after the reunification period that may justify a change in a prior reunification order." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)

That being said, "[i]t is not enough for a parent to show *just* a genuine change of circumstances under the statute. The parent must show that the undoing of the prior order would be in the best interests of the child." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529; § 388, subd. (b).) Some factors which "provide a reasoned and principled basis on which to evaluate a section 388 motion" include "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F., supra,* at p. 532.)

"[T]he burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a change of placement in the best interests of the child." (*In re Stephanie M*. (1994) 7 Cal.4th 295, 317.)

"'Whether a previously made order should be modified rests within the dependency court's discretion, and its determination will not be disturbed on appeal unless an abuse of discretion is clearly established.'" (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685; see also *In re Casey D., supra,* 70 Cal.App.4th at p. 47.) "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" (*In re Stephanie M., supra,* 7 Cal.4th at pp. 318–319.) Thus, we will not reverse a juvenile

court's denial of a section 388 petition """"unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].""" (*In re Stephanie M., supra,* at p. 318.) "It is rare that the denial of a section 388 motion merits reversal as an abuse of discretion." (*In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 522.)

B. The juvenile court rightly denied mother's first section 388 petition

On June 24, 2014, mother filed her first section 388 petition, asking that the juvenile court reinstate reunification services.

The juvenile court rightly summarily denied mother's section 388 petition because she did not demonstrate changed circumstances or that reunification services would have advanced Eric's best interests.

Eric was only two years old when he was detained from mother and placed in foster care. During the two years that passed between his detention and the filing of mother's first section 388 petition, mother had completed a substance abuse program and parenting classes and enrolled in individual therapy. But, just months later, she began to miss drug tests, she was terminated from individual therapy for excessive absences, and she tested positive for methamphetamines.

When mother filed her section 388 petition on June 24, 2014, she had been enrolled in another inpatient drug treatment program, but for only two months. While she alleged that she was no longer in a relationship with father, she and father continued to attend visits together. These facts confirm that circumstances had not changed for mother; she failed to comply with her reunification plan even though she had been granted the maximum 18 months of services.

Meanwhile, Eric continued to live with Mr. and Mrs. R. Since being placed with them almost two years earlier, he had improved tremendously. He was playful and sociable. He was no longer scared of people and did not hide from others. He was always neatly dressed and had good hygiene. Mr. and Mrs. R. were committed to providing Eric with a stable home. Mother has not demonstrated how reinstating reunification services would have been in Eric's best interests. (See *In re Marilyn H.*,

16

*supra*, 5 Cal.4th at pp. 307–309 [after termination of reunification services, the child's interest in stability outweighs any interest in reunification and there is a presumption against reinstating services].)

On appeal, mother objects to the juvenile court's reasoning in denying her section 388 petition. She contends that the juvenile court should not have summarily denied her section 388 petition on the grounds that a section 366.26 hearing was pending. The problem for mother is that we review a juvenile court's order, not the reasons for its order. (See *Becerra v. County of Santa Cruz* (1998) 68 Cal.App.4th 1450, 1457; *United Pacific Ins. Co. v. Hanover Ins. Co.* (1990) 217 Cal.App.3d 925, 933 ["We uphold judgments if they are correct for any reason, 'regardless of the correctness of the grounds upon which the court reached its conclusion.' [Citation.]"].) As set forth above, the juvenile court rightly summarily denied mother's section 388 petition, regardless of the reason it gave.

C. The juvenile court rightly denied mother's second section 388 petition

1. *Jurisdiction*

Preliminarily, we address DCFS's contention that we lack jurisdiction to review this juvenile court order. After all, as mother concedes, the August 19, 2014, order denying her second section 388 petition is a separately appealable order that was not mentioned in her notice of appeal.

DCFS correctly points out that an aggrieved party must file a timely notice of appeal from an appealable order to obtain appellate review. But, under the circumstances presented in this case, we opt to follow *In re Madison W.* (2006) 141 Cal.App.4th 1447, 1450 and deem the notice of appeal from the order terminating mother's parental rights to include mother's challenge to the juvenile court's August 19, 2014, order. Mother brought this issue to our attention immediately, in her opening brief. (*Ibid.*) And, "the denial of such a section 388 petition is an appealable order." (*In re Madison W.*, *supra*, at p. 1450.) Moreover, mother's "notice of appeal is entitled to our liberal construction." (*Ibid.*) Further, appellate jurisdiction depends upon a timely notice of appeal and the August 27, 2014, notice of appeal would have been timely as to the denial of mother's

17

second section 388 petition.  (*In re Madison W.*, *supra*, at p. 1450.)  Finally, DCFS is not prejudiced.  (*Ibid.*)

## 2. *Merits of mother's appeal*

In her second section 388 petition, mother asks that the juvenile court reinstate reunification services, make a home of parent (mother) order, or order guardianship. [3]

For the reasons set forth above, we conclude that the juvenile court did not err in denying mother's section 388 petition.[4]  Mother did not establish that circumstances had changed or that granting the petition was in Eric's best interests.

Mother argues that she had completed a drug treatment program and was no longer in a relationship with father.  But, mother had only just completed her drug treatment program—one month prior to filing her section 388 petition.  That little time is insignificant given the lengthy history of this case.  And, as set forth above, mother had completed a prior drug program on February 12, 2013, but months later tested positive for methamphetamines.  As for her contention that she no longer is in a relationship with father, we cannot ignore the evidence that she and father attended Eric's visits together.  And, there is no evidence that mother addressed the domestic violence issue in this case.  Finally, mother did not demonstrate that reinstating reunification services or returning Eric to her home were in Eric's best interests.  Mother's visits with Eric were problematic and had never progressed beyond monitored.  Under these circumstances, the juvenile court properly denied mother's section 388 petition.  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464–465.)

---

[3]    We address the guardianship issue in conjunction with our analysis of the juvenile court's order terminating parental rights.

[4]    We address the merits of mother's section 388 petition as if it had been denied on the merits, setting aside the question of whether the juvenile court erred in setting the hearing on the section 388 petition after it held the section 366.26 hearing.

18

**DISPOSITION**

The juvenile court's judgment and orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
                ASHMANN-GERST

We concur:


_____, J.
            CHAVEZ


_____, J.
            HOFFSTADT

19